O

# United States District Court
# Central District of California

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DISCOUNTMETALBROKERS, INC., *et al.*,<br><br>Defendants. | Case № 2:16-cv-2112-ODW(JC)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [73]** |

## I. INTRODUCTION

Plaintiff Federal Trade Commission ("FTC") alleges that Donald Dayer and Katherina Dayer violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Mail, Internet, or Telephone Order Merchandise Rule ("Merchandise Rule"), 16 C.F.R. Part 435 (Compl. ¶ 1, ECF No. 1.) Plaintiff alleges that Defendants distributed advertisements which contained misrepresentations, failed to ship merchandise in the required time frame, and failed to offer consumers remedial measures upon nonreceipt of their merchandise. (*Id.*) Before the Court is the FTC's unopposed Motion for Summary Judgment. (Mot., ECF No. 73.) For the reasons discussed below, the Court **GRANTS** the Motion.

///

## II. FACTUAL BACKGROUND

Between 2008 and 2014, Defendant DiscountMetalBrokers, Inc., f/k/a Discount Gold Brokers, Inc., Discount Metal Brokers, Inc. d/b/a Discount Gold Brokers, and North American Discount Gold.com ("DGB"), sold gold and silver to customers throughout the United States. (FTC's Statement of Uncontroverted Facts & Conclusions of Law ("SUF") ¶¶ 8–10, 32, 33, 55, ECF No. 74.) During this time, Defendant Donald Lee Dayer ("Mr. Dayer") represented on various business and legal documents that he served a myriad of positions in DGB, including President, Secretary, CEO, Vice-President, and officer. (SUF ¶¶ 15, 93, 113, 117, 175, 176.) Similarly, Defendant Katherina Dayer ("Mrs. Dayer") also represented on various documents that she held a number of positions at DGB, including President, Secretary, and officer. (SUF ¶¶ 18, 92, 102, 104.) Around January 2012, Defendant Michael Berman ("Berman"), a close friend of Mr. Dayer, served as DGB's Chief Financial Officer. (SUF ¶¶ 94, 222.)

In 2008, Mr. Dayer and Mrs. Dayer (collectively, "the Dayers") registered DGB's online website with Go Daddy and listed their personal phone number as well as their personal email address on the website as DGB's contact information. (SUF ¶¶ 97–101.) In 2009 and 2010, Mrs. Dayer created multiple buyer accounts on behalf of DGB with various precious metals sellers. (SUF ¶¶ 102–106.) Mr. Dayer signed numerous contracts and agreements on behalf of DGB, including multiple office space leases. (SUF ¶¶ 109–16.) In 2009, Mrs. Dayer opened a Citibank account on behalf of DGB and gave Mr. Dayer signing authority to that account—which he utilized often. (SUF ¶¶ 120–24.) After Mrs. Dayer opened the Citibank account, Mr. Dayer also opened Wells Fargo and US Bank accounts on behalf of DGB. (SUF ¶¶ 127–37.) Defendant Michael Berman was granted access to the Wells Fargo bank account and Berman later opened and controlled an additional Wells Fargo on behalf of DGB. (SUF ¶¶ 130, 132.) On numerous occasions, the Dayers wrote checks to themselves, to each other, to another business they owned, or to Michael Berman from one or all

of the DGB bank accounts. (SUF ¶¶ 139–44.) During the course of DGB's operations, Mrs. Dayer would often sign checks and other official documents at the request of Berman without questioning the amounts. (SUF ¶¶ 226–27.) Mrs. Dayer testified that she was aware that Berman had "issues" from a past business and that those issues were the reason Berman did not sign these documents himself. (SUF ¶ 225.)

DGB marketed their gold and silver via television advertisements, radio advertisements, and online platforms. (SUF ¶¶ 40, 44, 46.) The Dayers had virtually complete control over DGB's marketing and advertisement material, which included creating the content and appearance of the advertisements. (SUF ¶¶ 159–83.) Mr. Dayer worked on the graphics, script, and production of DGB's advertisements. (SUF ¶ 166.) DGB's advertisements ran on a number of networks and stations, including Fox News Network, Turner Broadcasting System, and various radio programs. (SUF ¶¶ 10, 44, 46.) DGB's television advertisements promised its viewers the sale of gold or silver at "zero percent above dealer cost" with "zero commissions, fees, or expenses." (SUF ¶¶ 47–49.) The DGB advertisements claimed "Discount Gold Brokers is making your dream a reality." (SUF ¶ 53.) The advertisements also urged viewers and listeners to place an order for DGB's merchandise by calling the phone number listed in the advertisements or by going online to the DGB website. (SUF ¶ 54.) DGB's advertisements did not include information regarding the expected shipment time nor did it warn consumers about possible shipment delays. (SUF ¶¶ 57–58.)

When a consumer would contact DGB to place an order, they were first asked to pay a deposit. (SUF ¶ 59.) After the consumer payed the initial deposit, DGB required the consumer to send the remaining balance owed by wire or check to a DGB bank account. (SUF ¶ 62.) Next, DGB sent the consumers who paid the full balance a confirmation email which instructed them to "allow a minimum of 2–4 weeks for delivery of [their] product upon the clearing of [their] funds." (SUF ¶ 65.) A similar

wait time estimate was also indicated on DGB's website. (SUF ¶ 69.) In a number of instances, DGB either shipped the products after more than thirty days or completely failed to ship the products at all. (SUF ¶¶ 70, 87–89.) When shipments were not received thirty days after an order was placed, DGB did not automatically issue a refund, provide consumers the opportunity to consent to shipment delay, or offer consumers the option to cancel their orders. (SUF ¶¶ 71–73.)

Numerous consumers called DGB to inquire about the status of their orders. (SUF ¶ 74.) In response, DBG told consumers that their gold or silver would "ship soon," but did not provide a definitive deadline or shipping date. (SUF ¶¶ 74–76.) Although many consumers demanded refunds due to the shipment delays, DGB refused to issue any such refunds. (*See* SUF ¶¶ 70, 81.) Consumers also filed complaints with a multitude of governmental agencies including the Better Business Bureau, local law enforcement, state attorneys general, and the Federal Trade Commission. (SUF ¶¶ 82–86.) Only in a few instances did DGB eventually fulfill customer orders or process refunds. (*See* SUF ¶ 87.)

Many consumers lost great sums of money when DGB failed to ship their goods or issue a refund. (SUF ¶ 242.) Further, the Dayers did not maintain accurate records of DGB's business dealings. (SUF ¶¶ 240–41.) From 2012 to 2014, DGB received an estimated $39,270,295.52 from customers and paid an estimated $32,743,735.56 to third-party precious metals suppliers. (SUF ¶¶ 246, 248.)

On March 8, 2016, Plaintiff filed this action, seeking equitable relief and a permanent injunction pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), for violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Mail, Internet, or Telephone Order Merchandise Rule ("Merchandise Rule"), 16 C.F.R. Part 435. (Compl. ¶ 1, ECF No. 1.) Plaintiff has moved for summary judgment against Defendants Donald Dayer and Katherina Dayer on all counts. (ECF No. 73.) That Motion is now before the Court for consideration.
///

## III. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Moreover, though the court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Where the moving and nonmoving parties' versions of events differ "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the nonmoving party.'" *Scott*, 550 U.S. at 378 (quoting *Saucier v. Katz*, 533 U.S. 194 201 (2001)).

## IV. DISCUSSION

Plaintiff's Motion raises the following issues: (1) whether DGB violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); (2) whether DGB violated the Mail, Internet, or Telephone Order Merchandise Rule ("Merchandise Rule"), 16 C.F.R. Part 435; (3) whether the Dayers are personally liable for DGB's violations; (4) whether the Court may grant an injunction pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and (5) whether the amount of monetary relief proposed by the FTC is an appropriate measure of restitution.

///

///

## A. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)

Section 5(a) of the FTC Act makes it unlawful to engage in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). In order to establish that a defendant engaged in deceptive acts, Plaintiff must demonstrate: (1) that "there is a representation, omission, or practice"; (2) which "is likely to mislead consumers acting reasonably under the circumstances"; and (3) that "the representation, omission, or practice is material." *F.T.C. v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). An advertisement may be found deceptive based on a representation which is explicit or conveyed through the advertisement's "net impression." *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

First, it is undisputed that DGB's various advertisements did not mention the potential nonreceipt of goods or shipping delays. While DGB's television and radio advertisements never made any explicit representations regarding estimated shipping times, by not disclosing critical details regarding shipment times, DGB created the impression that consumers would, at the very least, receive the goods they paid for. The DGB advertisements created the "net impression" that if a consumer placed an order and then paid for the gold or silver, they would receive their goods in a timely manner. *See Cyberspace.Com*, 453 F.3d at 1200.

Second, a representation is likely to mislead consumers when the advertisement is either false or the advertiser lacked a reasonable basis for the claim. *See F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994); *see also F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012). In making the determination of whether there was a reasonable basis for a defendant's representation, the court "must first determine what level of substantiation the advertiser [was] required to have for [its] advertising claims. Then, the [court] must determine whether the advertiser possessed that level of substantiation." *Pantron I*, 33 F.3d at 1096.

Here, DGB lacked a reasonable basis for their advertisements' representations that goods would be delivered upon receipt of payment. In order to substantiate the representation that goods would be delivered to consumers, let alone in a timely manner, DGB needed to be in possession of information that suggested it could fulfill those orders. Moreover, if DGB possessed information which indicated their inability or unlikeness to deliver the goods, then it would not be able to substantiate the advertisements' representations. Because DGB had knowledge of the delivery deficiencies at the time the advertisements aired, DGB could not have substantiated a reasonable basis for the advertisements' representations on shipping and delivery.

Lastly, an advertisement's misleading impression is material "if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.Com LLC*, 453 F.3d at 1201 (citing *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)). Here, DGB's representation that ordered goods would be delivered was material. It is not practical to suggest that any consumer would purchase an item or good without finding delivery of said item material to their decision to purchase. Information that goods may never be delivered is important information to consumers. Surely, if consumers were aware that there was a likelihood, that the goods they paid for would never come, they would not have engaged in business with DGB. Furthermore, it can be inferred that a prolonged delay of the shipment of goods was also material to consumers, especially given that many consumers were paying great sums of money for the merchandise.

Based on the uncontroverted facts, Defendants' misrepresentations violated Section 5(a) of the FTC Act; therefore, the Court **GRANTS** summary judgment on Plaintiff's FTC Act claim.

///

///

///

///

## B. The Mail, Internet, or Telephone Order Merchandise Rule, 16 C.F.R. Part 435 ("The Merchandise Rule")

The Merchandise Rule[1] states that when a seller solicits consumers to purchase their goods for sale via mail, internet, or telephone, they must have a reasonable basis to believe that any order will ship either: "within that time clearly and conspicuously stated in any such solicitation; or if no time is clearly and conspicuously stated, within thirty (30) days after receipt of a properly completed order from the buyer." 16 C.F.R. § 435.2(a)(1).

Furthermore, when a seller is unable to comply with the shipping requirements of the Merchandise Rule, they must offer the buyer an opportunity to either receive a refund or consent to further delay. 16 C.F.R. § 435.2(b)(1). When a seller has failed to maintain "records or other documentary proof establishing its use of systems and procedures which assure the shipment of merchandise" in compliance with Merchandise Rule, there is a "rebuttable presumption that the seller lacked a reasonable basis for any expectation of shipment within said applicable time." 16 C.F.R. § 435.2(a)(4). A rebuttable presumption is also created when the seller has failed to maintain records establishing any offers of refunds or consumers' consent to further delay in the event they are unable to ship in a timely manner. 16 C.F.R. § 435.2(d).

Here, DGB lacked a reasonable basis to believe that orders would ship within the guidelines provided by the Merchandise Rule. DGB was required to ship consumers' orders no later than thirty days after orders were completed. *See* 16 C.F.R. § 435.2(a)(1). Because DGB did not "clearly and conspicuously" state a shipping time frame in their advertisements, the Merchandise Rule required shipment of completed orders within thirty days. *See id.* On numerous occasions, DGB failed to ship items within thirty days—if at all. Thus, DGB failed to meet the time allotted by both the Merchandise Rule as well as time estimates indicated in their email

---

[1] 16 C.F.R. Part 435.

confirmations. Moreover, DGB's failure to maintain adequate shipping records creates a rebuttable presumption that DGB lacked a reasonable basis to believe they could ship goods within the guidelines provided by the Merchandise Rule.

Further, DGB failed to offer consumers an opportunity to either receive a refund or consent to further delay. DGB refused to provide refunds on numerous occasions despite many consumers demanding their money back. DGB issued *some* refunds only after several consumers complained to governmental agencies. DGB's lack of record keeping in regard to consumers' refunds or consumers' consent to further delays creates another rebuttable presumption that DGB lacked a reasonable basis to expect that the goods would be shipped in compliance with the Merchandise Rule.

Because DGB did not oppose this Motion, the Court presumes DGB lacked a reasonable basis for an expectation of shipment pursuant to the guidelines provided in the Merchandise Rule. Therefore, the Court **GRANTS** summary judgment on FTC's Merchandise Rule claims.

**C.     Individual Liability for Corporate Violations**

Personal liability for injunctive relief based on corporate violations of the FTC Act may be found where: "(1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities." *F.T.C. v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014). In order to hold an individual personally liable for equitable monetary restitution, the FTC must also establish that the individual possessed knowledge of the corporation's bad acts. *See Grant Connect, LLC*, 763 F.3d at 1101.

First, DGB's advertisements created the implicit representation that products would be delivered. A reasonably prudent person would rely on such a representation. As a result, many consumers were injured by DGB's misrepresentations because they paid for goods they never received. Second, an individual's active involvement in

business affairs or operations (including serving as a corporate officer) may establish that the individual directly participated in the violations or had authority to control the entities. *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)[2]; *see also F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989). Here, the Dayers were actively involved in DGB's deceptive acts. Donald Dayer played a critical role in creating the content and appearance of the various advertisements that DGB placed on news networks and radio programs. When requested, Mrs. Dayer assisted Mr. Dayer in coordinating with the various networks that aired the advertisements created by Mr. Dayer. Furthermore, the Dayers had authority to control DGB, because they were both corporate officers, signed binding legal documents on behalf of DGB, created accounts with various precious metals suppliers, and maintained control of corporate funds.

Lastly, the Dayers possessed the requisite knowledge to be found personally liable for equitable monetary relief. The Dayers' conduct demonstrates that they both were "recklessly indifferent to the truth or falsity of the misrepresentation." *See Stefanchik*, 559 F.3d at 931.[3] The Dayers placed a great deal of trust in Michael Berman, despite their knowledge that Berman had "issues" regarding his past business endeavors. The Dayers knew about consumer complaints regarding shipping, but continued to rely on Berman to handle daily business operations. The Dayers' blind trust in Berman (who possessed a central role in DGB's daily business operations) demonstrates the requisite level of reckless indifference to establish liability. *See Publ'g Clearing House*, 104 F.3d at 1171 (the defendant was found to be recklessly

---

[2] In determining whether the corporate-officer defendant may be held personally liable for corporate actions, the court noted that the defendant's "assumption of the role of president of [the corporation] and her authority to sign documents on behalf of the corporation demonstrate[d] that she had the requisite control over the corporation." *Publ'g Clearing House, Inc.*, 104 F.3d at 1170 (9th Cir. 1997).

[3] The Court found that the defendant was recklessly indifferent when he had the authority to control the marketing and representations about his product. *Stefanchik*, 559 F.3d at 931.

indifferent when she filed a business license at the direction of someone she knew faced issues with the law).

DGB's advertisements created the implicit representation that products would be delivered, and a reasonably prudent person would rely on such a representation. Further, the Dayers participated directly in the violations and had authority to control DGB. Therefore, it is appropriate to impose personal liability on Defendants Donald and Katherina Dayer for the acts of DGB.

## D. Permanent Injunction

The FTC seeks a permanent injunction against the Dayers to enjoin them from marketing any investment opportunities to consumers and from violating the FTC Act and the Merchandise Rule in the future. Section 13(b) of the FTC Act provides the following:

> "Whenever the [FTC] has reason to believe ... that any person ... is violating ... any provision of law enforced by the Federal Trade Commission, and ... that the enjoining thereof ... would be in the interest of the public—the Commission ... may bring suit in a district court of the United States to enjoin any such act or practice."

15 U.S.C. § 53(b).

Section 13(b) grants courts the authority to issue a permanent injunction upon the FTC's showing of proper proof. *Id.* Furthermore, "[section 13(b)] has been interpreted to authorize [a court] to permanently enjoin defendants from violating the FTC Act if there is some cognizable danger of recurring violation." *F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999). In determining the likelihood of recurring violations, the court may consider past unlawful conduct as well as the "totality of the circumstances". *Id.* When the "violation has been predicated upon systematic wrongdoing, rather than isolated occurrences, a court should be more willing to enjoin future conduct." *Id.* (quoting *Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980)).

Here, there is a danger that the Dayers will violate the FTC Act again. The FTC has shown that the Dayers' deceptions and other shady business practices demonstrate a pattern of systematic wrongdoing, rather than mere isolated events. The totality of events from 2012–2014 suggest that the Dayers voluntarily chose to turn a blind eye toward the deficiencies of their business. The FTC has also shown that the Dayers were reckless in regard to the oversight and management of their business, and that such recklessness proved detrimental to countless consumers.

Therefore, the Court **GRANTS** the FTC's permanent injunction enjoining Katherina and Donald Dayer from marketing investments to consumers and from further violating the FTC Act and the Merchandise Rule. The injunction does not extend, however, to Plaintiff's recommendation of mandatory compliance reporting to the Commission.

### E.  Measure of Restitution

In calculating the measure of restitution to award under section 13(b), the Ninth Circuit has adopted a two-step burden shifting framework. *F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016). First, "the FTC bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *Id.* If the FTC meets their burden, "the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains." *Id.* at 604. The focus of the calculation should *not* be on what the consumer lost but, rather, the unjust gains made by the defendant. *See id.* at 603.

Often times, courts determining restitution stemming from violations of the FTC Act have awarded "the full amount of funds lost by consumers…" *F.T.C. v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1011 (N.D. Cal. 2010). It is possible for restitution to exceed the defendant's unjust enrichment. *Id.* Moreover, "[t]he FTC…is not required to prove that every individual consumer was injured to satisfy such an award." *Id.* The FTC need only demonstrate that "misrepresentations were widely disseminated…and caused actual consumer injury." *Id.*

Here, the FTC proposes that the Court adopt their calculation by measuring the difference between DGB's incoming payments from consumers (less returns, chargebacks, and refunds) and outgoing payments from DGB to precious metal suppliers. According to the FTC, the aforementioned calculation approximates that DGB received $6,526,559.96 in unjust gains between 2012 and 2014. (Mot. p. 20; George Decl. ¶ 10.) The FTC argues that there is no other way to reasonably ascertain the proper measure of unjust gains because of the Dayers' lack of recordkeeping. Furthermore, the FTC has established that DGB's misleading advertisements were widely disseminated across various media platforms.

The Court finds that the FTC's calculation is reasonable, in light of the Dayers' reckless indifference to the record keeping, oversight, and management of DGB. Because this Motion is unopposed, Defendants have failed to meet their burden of establishing that the figure presented by the FTC overstates the amount of unjust gains. Therefore, $6,526,559.00 is an appropriate measure of restitution in this case.

### V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff Federal Trade Commission's Motion for Summary Judgment.

**IT IS SO ORDERED.**

October 4, 2017

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**